Argued and submitted December 2, 1986, decision of Court of Appeals reversed, and judgment of trial court reinstated June 23, reconsideration denied July 28, 1987

ANDOR,
*Respondent on Review,*

*v.*

UNITED AIR LINES, INC. et al,
*Petitioners on Review.*

(TC A8301-00133; CA A32141; SC S33093)

739 P2d 18

James N. Westwood, Portland, filed the petition and argued the cause for Petitioners on Review. With him on the petition were Miller, Nash, Wiener, Hager & Carlsen, Portland; Shea & Gardner, Richard M. Sharp, and Michael S. Giannotto, Washington, D. C.

Stewart M. Whipple, Portland, filed a response and argued the cause for Respondent on Review. With him on the response were Alan H. Johansen and Whipple, Johansen & McClain, Portland.

LINDE, J.

## LINDE, J.

Plaintiff was a passenger injured in the crash of a United Air Lines plane near the Portland International Airport on December 28, 1978. In her action for compensatory and punitive damages, a jury awarded her $161,275.32 against United Air Lines, Inc. (United) and its pilot, McBroom, in general and special damages, no punitive damages against McBroom and $750,000 in punitive damages against United. Upon United's motion, the circuit court found insufficient evidence of the degree of "wanton misconduct" required to justify punitive damages and granted a judgment notwithstanding the verdict on that issue. The Court of Appeals reversed the judgment and ordered reinstatement of the punitive damages. *Andor v. United Air Lines,* 79 Or App 311, 719 P2d 492 (1986). Having allowed United's petition for review, we reverse the Court of Appeals.

The dispute concerns the propriety of punitive damages on the facts leading to the crash. We quote the summary of the facts from the opinion of the Court of Appeals:

> "Flight 173 was scheduled to arrive from Denver at the Portland International Airport at 5:13 p.m. The flight was normal until McBroom extended the landing gear. He described the 'abnormal extension' as 'a heavy to severe jolt-jolt * * *. This was not the normal slow extension, but immediate and was accompanied by a yaw to the right.' Fearing a problem with the landing gear, McBroom advised the Portland control tower at 5:12 p.m. that the landing would be delayed. The tower advised the crew to proceed to an area southeast of the airport in which the plane could circle while the crew attended to the situation.
>
> "The crew consulted a manual to diagnose the problem. They visually checked a mechanical indicator on the wing, which showed that the landing gear was in a down and locked position. Uncontradicted testimony established that [the] indicator provides an unerring positive indication that the gear is down and locked. McBroom still did not feel confident about the landing gear's safety, and at 5:40 p.m. he began consulting with ground personnel in Portland and San Francisco. After relating his situation, McBroom was informed 'You've done everything you can do.' At 5:42 p.m. McBroom reported that the plane had 7,000 pounds of fuel remaining and that he planned to hold for 15 to 20 minutes while the crew prepared the passengers for an emergency evacuation.

The San Francisco dispatcher confirmed a 6:05 p.m. landing with McBroom.

"At 5:49 p.m., with the gauges indicating that 5,000 pounds of fuel remained, the low fuel pressure warning lights illuminated. At 5:52 p.m. McBroom confirmed with United personnel in Portland that he would land at 6:05 p.m. with about 4,000 pounds of fuel. At 6:03 p.m. McBroom advised that he would begin his approach in three to five minutes and that the plane had 3,000 pounds of fuel left. At 6:07 p.m. the number four engine flamed out while the plane circled at 5,000 feet. The crew re-started the engine. At 6:13 p.m. two engines flamed out, and McBroom realized that he could not reach the airport. He crash-landed the plane about six miles southeast of the airport at 6:15 p.m.

"McBroom testified that at the time of the accident he thought, because of his training, that the fuel gauges were completely accurate unless they were obviously erratic or inoperative. Subsequent to the crash, he learned that there was an allowable tolerance in the fuel supply indicator system, to the extent of 426 pounds for each of the eight fuel tanks and an additional 1,000 pounds for the totalizer system. That amounts to a total tolerance, or potential inaccuracy of 4,408 pounds. He testified that, if he had known of those tolerance figures at the time of the accident, he would have taken them into account in deciding how long he could safely stay aloft.

"There was evidence that the initial abnormal extension was due to preexisting corrosion in the plane's landing gear. The parts of the landing gear which were corroded and failed when the gear was extended were the threads of an eyebolt and a piston. They were part of a hydraulic system which had the function of slowing the extension of the landing gear. Plaintiff's uncontradicted evidence shows that United employes were aware of the corrosion problem on DC-8's in general and on the right landing gear of this plane in particular. United had detected the corrosion by means of a gamma ray inspection and had attempted to seal the connection to retard the corrosion. United stopped the gamma ray inspections in 1977, when it installed a 'bungee system improvement,' which ostensibly guaranteed that the landing gear would come down and lock in the proper position if the hydraulic system failed. Although, as we will discuss below, United argues that its maintenance of the landing gear provides no basis for the jury's award of punitive damages, it does not dispute that its personnel were aware of the corrosion in the parts, that the parts were not replaced and that the corrosion was not cured."

79 Or App at 313-15, 719 P2d 492.

Defendants did not dispute liability for compensatory damages based on ordinary negligence, but they moved to take plaintiff's claim for punitive damages from the jury. The circuit court denied the motion and submitted the issue to the jury with instructions that it might award punitive damages "only if defendants' conduct goes beyond mere carelessness to a willful or wanton disregard of risk of harm to others of a magnitude evincing a high degree of social irresponsibility," that "wanton misconduct is conduct amounting to a deliberate disregard of the rights and safety of others" and "something worse than negligence but less than intentionally hurting someone." After the jury returned its verdict of punitive damages against United, however, the circuit court granted United's motion for judgment notwithstanding the verdict, ruling that the evidence left no jury question on punitive damages.

In reversing the circuit court's ruling, the majority of the Court of Appeals, *in banc,* stated its disagreement with United's position and with the dissent in these terms:

> "It is well-established that whether a defendant's conduct is aggravated or wanton or comes within any of the other characterizations that permit the imposition of punitive damages is for the jury to decide, as long as there is evidence upon which the finding can be based. * * * However, * * * the Supreme Court and this court have periodically succumbed to the temptation to make an impermissible independent normative evaluation of the aggravatedness of a defendant's conduct in the guise of reviewing for evidentiary sufficiency. * * * That is essentially what United asks us to do here, and that is essentially what the dissent does. We decline to do so. Our function is to determine whether the evidence and the inferences, taken at their strongest, rationally support the jury's finding; it is not our function to make our own assessment of how defendants' conduct should be characterized."

79 Or App at 315-16 (citations omitted). The court continued with a discussion of formulations appearing in recent opinions that leave in doubt what constitutes aggravated or "wanton" misconduct, the term used in the circuit court's instruction on punitive damages. The Court of Appeals concluded that punitive damages were not limited to "intentional or wilfully injurious torts" and that there was sufficient evidence from

which the jury could infer that United had committed "wanton" misconduct as defined in the trial court's instructions. 79 Or App at 320-21.

United's petition for review is directed to the adequacy of the evidence rather than to the phrasing of the instructions. The parties' briefs, however, compare the facts in this case with the facts and the opinions in other cases in which this court has allowed or disallowed awards of punitive damages. Doubtless there has been in review of punitive damages the blending of facts and legal standards, of the roles of courts and juries, to which the Court of Appeals referred. They are not easily disentangled.

We do not here review in detail the many cases quoted by the parties. The problem of disentangling facts and legal standards arises because judicial statements of criteria for punitive damages have sought to encompass very different situations in one general formulation. *See Weigel v. Ron Tonkin Chevrolet Co.,* 298 Or 127, 139 n 7, 690 P2d 488 (1984). The defendant's culpability may range from a deliberate purpose to cause harm to the plaintiff or to others regardless of gaining any benefit thereby,[1] through an intent to harm the plaintiff or others in order to benefit oneself,[2] and a readiness to benefit oneself with conscious indifference to or disregard of a known or highly probable risk of severe harm to others[3] to a readiness to expose others to such risks without intending

---

[1] *See, e.g., Lewis v. Oregon Beauty Supply Co.,* 302 Or 616, 733 P2d 430 (1987) (punitive damages for nonverbal infliction of severe emotional distress); *Roshak v. Leathers,* 277 Or 207, 560 P2d 275 (1976) (punitive damages for assault and battery); *Gumm v. Heider,* 220 Or 5, 348 P2d 455 (1960) (punitive damages for malicious prosecution).

[2] *See, e.g., Green v. Uncle Don's Mobile City,* 279 Or 425, 568 P2d 1375 (1977) (punitive damages for fraud arising out of purchasing agreement); *Starkweather v. Shaffer,* 262 Or 198, 497 P2d 358 (1972) (punitive damages for nondisclosure of unfair purchase price by fiduciary in real estate sale); *Lewis v. Worldwide Imports, Inc.,* 238 Or 580, 395 P2d 922 (1964) (punitive damages for fraudulent representation in sale of automobile); *Fisher v. Carlin,* 219 Or 159, 346 P2d 641 (1959) (punitive damages for cutting neighbors' trees to improve defendants' view).

[3] Perhaps the best-known example of such culpability is a series of cases involving accidents of Ford Pinto automobiles which Ford Motor Company cost-saving measures made more susceptible to explosion and fire when struck from behind. *See Grimshaw v. Ford Motor Co,* 119 Cal App 3d 757, 174 Cal Rptr 348 (1981). *See also McElwain v. Georgia-Pacific Corp.,* 245 Or 247, 421 P2d 957 (1966) (punitive damages for intentional discharge of pollutants).

any countervailing benefit to anyone.[4] The defendant may be an individual or it may be an enterprise or other organization, which poses the question where the culpable mental state is to be located.[5] The conduct at issue may be a single act, or it may be repeated, or continuous, or a failure to act. The interests culpably invaded or disregarded ordinarily are personal to the plaintiff, but occasionally punitive damages are imposed for breach of a public responsibility.[6] The aim of punitive damages, as of punishment in other contexts, may be to deter the defendant, or to deter others, or to reaffirm and vindicate social norms for their own sake even when the efficacy of deterrence is doubtful.

The cases have tried to bring all these variables within a general formula for punitive damages that relies heavily on condemnatory terms such as "malice," "aggravated" and "socially irresponsible," and verbal gradations of culpability such as "willful," "wanton" and "reckless." Some degree of imprecision often is the price of formulations to be submitted a jury, as is true in the vast range of different cases tried under the general formulas of negligence; but vagueness is less defensible when the issue is not whether an injured plaintiff is to be compensated but whether the defendant also is to be punished.[7] The condemnatory formulas do not make

---

[4] *See, e.g., Harrell v. Ames,* 265 Or 183, 508 P2d 211 (1973) (punitive damages awarded against defendant who struck plaintiff while driving under the influence of intoxicants); *Dorn v. Wilmarth,* 254 Or 236, 458 P2d 942 (1969) (same).

Punitive damages may be justified by failure to perform a special duty of attention and care arising out of a professional or fiduciary relationship that would not apply between strangers. *See, e.g., Noe v. Kaiser Foundation Hosp.,* 248 Or 420, 425, 435 P2d 306 (1967). "The explanation for a different rule in malpractice cases is * * * the character of the defendant's profession and the obligation it imposes." *Id.* at 423, *citing Olson v. McAtee,* 181 Or 503, 182 P2d 979 (1947).

[5] *See Stroud v. Denny's Restaurant,* 271 Or 430, 532 P2d 790 (1975).

[6] *Weigel v. Ron Tonkin Chevrolet Co.,* 298 Or 127, 139 n 7, 690 P2d 488 (1984), noted the confusion between "social obligations," and "societal interests." *Cf. Lane County v. Wood,* 298 Or 191, 691 P2d 473 (1984) (punitive damages for breach of official duties even though only nominal damages awarded to county).

[7] *See* Ellis, *Fairness and Efficiency in the Law of Punitive Damages,* 56 S Cal L Rev 1, 34-37 (1982) (discussing vagueness of punitive damages standards); Schwartz, *Deterrence and Punishment in the Common Law of Punitive Damages: A Comment,* 56 S Cal L Rev 133 (1982) (discussing problem in context of deterrence and punishment purposes of punitive damages); Note, *The Imposition of Punishment by Civil Courts: A Reappraisal of Punitive Damages,* 41 NYU L Rev 1158, 1178-80 (1966) (arguing that vagueness of substantive criteria for punitive liability raises constitutional difficulties).

the differences in factual patterns disappear. Perhaps more differentiated jury instructions should be developed to identify the factual elements on which punitive damages depend in essentially different types of cases,[8] but the instructions here are not in issue. Rather the present formulas require attention to the judicial role in determining whether in the particular pattern before the court there is a factual basis for each necessary element on which a factfinder may award punitive damages.

That role is rather analogous to the court's role in the tort of intentional infliction of severe emotional distress, which also involves jury evaluation of conduct under social norms that elude precise or quantified statement. In such cases, the court first may have to decide whether the defendant's relationship to the victim imposes obligations greater than would be true toward a stranger, a question that "bears

---

[8] For example, punitive damages long were said to follow from a finding of "malice," a word that ordinarily would convey an intentional wrong done with no other motive than to inflict some tangible or psychic injury on another, the first type of culpable intent mentioned above. When punitive damages were extended to other forms of culpable misconduct, the culpability required in different contexts could have been freshly formulated, but instead "malice" was redefined to encompass them, as noted in *Friendship Auto v. Bank of Willamette Valley,* 300 Or 522, 534-35, 716 P2d 715 (1986), *quoting McElwain v. Georgia-Pacific Corp., supra* n 3, 245 Or at 249, 421 P2d 957. *See also* Ellis, *supra* n 7, at 34-39.

A commentator notes:

"There is very little discussion in the cases or commentary on punitive damages addressing whether and how the standards of misconduct for which punitive damages are justified should be altered to fit the type of defendant in the case. Nevertheless, at least three types of defendants stand out as possibly deserving separate treatment: (1) individual defendants; (2) professional defendants; and (3) institutional defendants. The kinds and amounts of power a person holds over the welfare of another will vary among these types of defendants, as will the social expectations as to how the power should be controlled by each person. Surely the forms of power and motivations of a drunk driver are different in substantial measure from those of a malpracticing doctor, or stock broker, and are different in turn from misconduct by a power company or an automotive manufacturer."

Owen, *Civil Punishment and the Public Good,* 56 S Cal L Rev 103, 105 (1982) (footnotes omitted).

In one area, the "products liability civil action" defined in ORS 30.900, the Legislative Assembly has enacted criteria for punitive damages, including among others the likelihood of serious harm, the degree of defendant's awareness thereof, the profitability of defendant's misconduct, the duration and any concealment of the misconduct, and the defendant's reaction to its discovery. ORS 30.925. Because the jury instructions are not in issue, we do not here consider what bearing the legislative policy may have for similar types of torts not defined as products liability civil actions.

on the mental element required to impose liability" and also on "the offensiveness of conduct that crosses the threshold of potential liability." *Hall v. The May Dept. Stores,* 292 Or 131, 137, 637 P2d 126 (1981). Second, the court may be called upon to decide "whether the acts alleged against the defendant, if proved, qualify as extraordinary conduct which a reasonable jury could find beyond the farthest reaches of socially tolerable behavior," and, third, "whether there is evidence from which a reasonable jury may find that a disputed relationship in fact existed and that the defendant in fact engaged in conduct meeting the second test." *Id. Hall* continued by noting that the second of these is "a judgment of social standards rather than of specific occurrences" and "does not demand the same evidentiary basis that is required for reconstructing disputed events"; nevertheless, "each issue is subject to judicial decision in the familiar manner when reasonable factfinders could reach only one conclusion on the evidence." 292 Or at 137-38. In judging the propriety of punitive damages, the variables of motive, intent, and aggravated disregard of personal rights and social responsibilities are somewhat different, and a jury's determination of disputed historic facts and its determination of the gravity of misconduct justifying punitive damages merge in one general verdict, ORCP 61 A., although these issues can be sharpened by instruction and by interrogatories, ORCP 61 C. Generally, however, the familiar division of the judicial and factfinding functions is the same.

We turn to the problem presented in this case. This obviously is not a case of conduct motivated by personal hostility or intention to injure anyone. Defendant is a large enterprise engaged in a type of service, passenger transportation, which demands a high standard of safety and in which loss of an aircraft and death or injury of passengers are a potentially disastrous loss to the enterprise itself. Plaintiff's claim for punitive damages rests on the theory that United was guilty of a high degree of social irresponsibility at two stages of the events culminating in the crash, one before and one after the abnormal extension of the right landing gear: first, in disregarding risks to its passengers by deciding to save the costs of replacing the corroded eyebolt, and second, in the conduct of its crew after the eyebolt failed.

The first part of that theory places this case, as we

said about another enterprise in *Schmidt v. Pine Tree Land Dev.,* 291 Or 462, 631 P2d 1373 (1981), with those in which

> "punitive damages serve the function to deter enterprises from accepting the risks of harming other private or public interests by recklessly substandard methods of operation at the cost of paying economic compensation to those who come forward to claim it. *See, e.g., McElwain v. Georgia Pacific Corp.,* 245 Or 247, 421 P2d 957 (1966)(air pollution); *cf. Reynolds Metals Co. v. Lampert,* 316 F2d 272, *aff'd on reh'g* 324 F2d 465 (9th Cir 1963), 372 F2d 245 (9th Cir 1967)(same). Such operations may well be wholly impersonal with respect to any victim, indeed conducted with the hope that no harm will occur, and they may not involve a culpable attitude on the part of any one person responsible for the management of the enterprise; yet this court has held that such lack of managerial culpability alone does not foreclose punitive damages."

291 Or at 466 (citations omitted).[9] As far as this theory of culpable choice is concerned, the present case differs from *McElwain v. Georgia-Pacific Corp.,* insofar as that defendant operated with knowledge that it actually was spreading harmful pollutants from its paper mill to neighboring lands, whereas United is charged with taking an unreasonable risk in order to save money. The case falls between *McElwain* and *Schmidt,* in which we held punitive damages unavailable when the defendant's double sale of some subdivision lots resulted from negligent record keeping.

The second part of plaintiff's theory is that the conduct of the pilot and other personnel after the abnormal extension of the landing gear was such as to satisfy the standard of willful or wanton misconduct on which the case was submitted to the jury. Evidently the trial court thought that a jury arguably might award punitive damages, if at all, only on this second basis, but the court considered the claim marginal at best and ultimately disallowed it upon defendant's motion for judgment notwithstanding the verdict.

---

[9] We continued:

"* * * In such a setting the plaintiff whose economic loss may be insignificant to the enterprise and perhaps too small to justify the expenses of pressing a claim represents social interests larger than his own."

*Schmidt v. Pine Tree Land Dev.,* 291 Or 462, 466, 631 P2d 1373 (1981) (citations omitted).

■ That reconsideration was not error. The evidence of the communications between the pilot and United's ground personnel in Portland and San Francisco and of the pilot's insistence on delaying the landing may show negligence, misjudgment, even stubbornness on the pilot's part, but there is no evidence that the pilot or anyone else disregarded or was indifferent to the safety of the plane and its passengers. McBroom was not suicidal; if anything, he erred on the side of excessive caution by doubting the advice that the landing gear was safe and using more time than his fuel supply allowed to prepare the passengers for landing. Misjudgment and negligence do not rise to the point of punitive damages by prefixing a quantifier like "gross."

■ United's choice to deal with the corrosion in its hydraulic landing gear system by installing an alternative "bungee" (or spring) system to secure the landing gear in the down position, rather than replacing the eyebolt assembly when it showed corrosion, presents a different problem. This was a deliberate management choice, and a factfinder might conclude that it qualified for punitive damages if the substituted system failed to work and the landing gear did not lock in place or buckled on landing. But that did not happen. The pilot was advised that the gear was down and safe for landing, and there is no evidence that it was not safe to land.[10] On this record, a claim of intentional or "wanton" disregard of the plane's mechanical safety cannot rest solely on the failure of the eyebolt.

The pilot, however, did not trust the advice that the landing gear was properly positioned and safe for landing. He and his crew had sensed a "heavy to severe" double jolt accompanied by a yaw of the aircraft to the right, suggesting an abnormal extension of the landing gear. His distrust of assurances that it nevertheless was safe to rely on the landing gear may only have been mistaken caution, but it had tragic consequences.

United argues that these consequences occurred only "through the concatenation of highly unusual circumstances".

---

[10] Plaintiff argues that United's claim of "uncontradicted" evidence of mechanical safety is only opinion evidence that a jury could disbelieve, but plaintiff in turn cited only the opinion of a witness that even if an aircraft could be landed with a defective eyebolt, the landing gear thereafter would fail if the aircraft were turned after landing.

beyond what a reasonable person might include in "an inventory of the possibilities of harm" that its actions with respect to the eyebolt might produce, quoting *Stewart v. Jefferson Plywood Co.,* 255 Or 603, 609, 469 P2d 783 (1970). *Stewart* dealt with the scope of liability for unlikely consequences of negligence, not with a test for punitive damages, and if the issue here were whether a rational jury must find the pilot's misjudgment to be a totally unforeseeable reaction to a malfunctioning landing gear for purposes of negligence liability, United would lose. But United's argument is that punitive damages require a measure of culpability very different from negligence, and that United's way of dealing with a corroded landing gear subsystem does not become "wanton" misconduct because a worried pilot fails to allow for possible error in his cockpit fuel gauges and misjudges his landing approach. Again, the trial court did not err in believing that, standing alone, United's failure to replace the corroded parts before they gave way was an insufficient basis for punitive damages.

■ Because United's separately negligent acts do not support punitive damages, the problem presented in this case is under what circumstances negligent actions of persons performing different functions in an organization cumulatively may allow a factfinder to find the performance of the organization as a whole so indifferent to known or highly predictable risks of harm as to evince the high degree of social irresponsibility that justifies punitive damages. We do not say that this can never be done, but we hold that the evidence, viewed most favorably to plaintiff, does not make out such circumstances here.

The strongest argument against United is that an organization which employs people and machines in an enterprise requiring an extraordinary level of safety may not separate its responsibility for the mechanical safety of the machines from its responsibility for the human performance of the personnel that operate them. The operator's performance, here that of the pilot, is an inseparable factor to be calculated in the safety of the machines. Even the most unquestionable certainty that the mechanical "bungee" system in fact would lock a landing gear in the position required for a normal landing would not relieve United of liability for plaintiff's injuries, either because United failed to prepare its

pilot for the possibility that a landing gear might drop abnormally though nevertheless safely, or because it is responsible for the pilot's performance even if he had been properly prepared for that possibility. United did not deny that liability.

Punitive damages, however, by definition are not part of a plaintiff's compensation for what she has lost; they are a penalty for conduct that is culpable by reason of motive, intent, or extraordinary disregard of or indifference to known or highly probable risks to others. The behavior of United's crew after the abnormal extension of the landing gear was not wholly beyond the risks that a jury might find foreseeable from United's prior decisions about the replacement or redesign of the gear, but mere failure to foresee the pilot's reactions is not enough for punitive damages. If this sufficed, it would support a claim for punitive damages whenever some persons within an organization failed to anticipate foreseeable risks of substandard performance by others in the organization. For punitive damages, some conscious disregard of or highly irresponsible indifference to this human element in the decision on equipment is required.

We do not suggest that an enterprise can evade the test simply by compartmentalizing responsibility for equipment and for operations. But this record shows nothing from which a jury could find that those responsible for United's aircraft maintenance consciously disregarded or blinded themselves to the possible reaction of a flight crew to an abnormal extension of the landing gear, though they may have failed to consider it. The circuit court correctly concluded that the evidence did not support the level of culpability expressed in the court's instructions to the jury.

The decision of the Court of Appeals is reversed, and the judgment of the circuit court is reinstated.