Argued and submitted May 2, 1990, the decision of the Court of Appeals affirmed in part and reversed in part and the judgment of the circuit court affirmed in part and reversed in part January 3, 1991

H. Raymond and Kirsten BADGER,
Lewis F. Bayer, Robert W. and Gayle J. Bearden,
John O. Beirwagen, William P. Bingham,
Rodger and Janet Eddy, John Elwick,
Allan W. Furney, Ellen Givens,
Charles and Betty Goff, John and Sylvia Greene,
Don Gregory, Edgar Limp and Fred L. Stallard,
*Respondents on Review,*

TINKER
and Entzel,
*Plaintiffs,*

*v.*

PAULSON INVESTMENT COMPANY, INC.,
*Petitioner on Review,*

FIDELITY AND DEPOSIT COMPANY
OF MARYLAND,
*Respondent,*

MAINSTREAM MINERALS CORPORATION,
Scientific Mining Corporation, Duane Babcock,
Zbigniew Lambo, Dennis Johnson, C. Scott Kennedy,
Mark D. Babcock, Bonnie Babcock, Keith M. Anderson,
G.A. Malocey, M.A. Krohnaus and John Does 1-20,
*Defendants.*

(CC 84-11-75; CA A45550; SC S36607)

803 P2d 1178

Joseph D. Cohen, of Stoel Rives Boley Jones & Grey, Portland, argued the cause for petitioner on review. With him on the petition for review was Charles F. Adams, Portland.

James C. Tait, of Canning & Tait, Oregon City, argued the cause and filed the response to the petition for respondents on review.

Before Peterson, Chief Justice, and Carson, Gillette, Van Hoomissen, Fadeley, and Unis, Justices.

PETERSON, C. J.

## PETERSON, C. J.

This is a civil case for damages arising from the sale of securities. The defendant, Paulson Investment Company (hereinafter referred to as Paulson), is an Oregon corporation engaged in the sale of securities as both a broker-dealer and an investment adviser. Two of Paulson's "registered representatives," Zbigniew Lambo and Scott Kennedy,[1] allegedly engaged in fraudulent securities practices and the sale of unregistered securities.[2] The plaintiffs seek to hold Paulson liable for the acts of Lambo and Kennedy on an agency theory.[3]

The record contains the following evidence, which we set forth as background for what follows. Before March 1982, Lambo and Kennedy were employed by T.E. Slanker, a Portland stockbroker. Slanker went out of business. Paulson took over the Slanker accounts. Lambo and Kennedy went to work for Paulson as registered representatives. Paulson informed the Slanker customers that it had taken over the Slanker accounts.

Thereafter, both Lambo and Kennedy made sales presentations to Paulson customers, including some of the plaintiffs. Solicitations and sales of the unregistered securities involved in this case were made using Paulson's letterhead. Sales presentations were made at Paulson's office.

Between August 11, 1982, and September 9, 1984, the plaintiffs purchased the unregistered securities. The securities proved to be valueless.

The plaintiffs thereafter brought claims against Paulson, Lambo and Kennedy. Claims for relief based on three theories were submitted to the jury.

---

[1] Lambo and Kennedy had written contracts with Paulson. The contracts describe each as a "registered representative," refer to the fact that they are "licensed" and that Paulson and its registered representatives are "accountable to Federal and State governmental and regulatory agencies."

[2] Lambo and Kennedy also were joined as defendants, along with Fidelity and Deposit Company of Maryland (a bonding company) and other persons whose precise roles are not relevant to this appeal. The claims against Kennedy were dismissed before trial.

[3] The plaintiffs also asserted and the jury found that the defendant was liable as a "controlling person" and as a participant or aider under ORS 59.115(3). We do not reach those issues because the evidence is sufficient to impose liability on the defendant as a principal. *See* footnotes 10 and 11, below.

The first claim was for sale of unregistered securities, ORS 59.115(1)(a).

The second claim was for securities fraud, ORS 59.115(1)(b).

The third claim was for common-law fraud, and for punitive damages.

At the conclusion of the presentation of the evidence, the trial judge stated that he would grant Paulson's motion for a directed verdict as to the plaintiffs' securities claims. The plaintiffs' counsel then asked the court to allow these claims to go to the jury pursuant to ORCP 63 B. The trial court, over Paulson's objections, agreed to do so, but made it clear that it would grant a motion for a judgment notwithstanding the verdict if the jury returned a verdict for the plaintiffs.

The jury returned a verdict for the plaintiffs against all defendants on all claims, including the punitive damages claim. The jury made these special findings:

1.  That Kennedy and/or Lambo were acting within their apparent authority in selling the securities.

2.  That Paulson did "directly or indirectly control Kennedy and/or Lambo."

3.  That Paulson did "participate or materially aid in the sale of [the] securities."

4.  That Paulson knew or should have known that Kennedy and/or Lambo were selling the securities.

5.  That "the sale by Kennedy and/or Lambo [was] made by means of one or more * * * untrue statements or omissions of material fact * * *."

6.  That the sales by Kennedy and/or Lambo constituted common-law fraud.

The trial court thereafter set aside the verdict for the plaintiffs against Paulson on the two securities claims. In addition, the trial court set aside the verdict against Paulson for punitive damages on the common-law fraud claim.

The plaintiffs appealed to the Court of Appeals. The Court of Appeals reversed the judgment notwithstanding the verdict, reinstated the plaintiffs' verdicts on the sale of unregistered securities and securities fraud claims, and reinstated

the punitive damages award on the common-law fraud claim. *Badger v. Paulson Investment Co., Inc.,* 98 Or App 200, 779 P2d 1046, *modified on recons,* 100 Or App 12, 784 P2d 125 (1989).[4]

This case involves these issues:

A. May common-law agency principles be invoked to impose liability as a seller against a principal for an agent's violation of ORS 59.115(1)?

B. Is the evidence of an apparent agency relationship between Paulson and Kennedy and Lambo sufficient to impose liability on Paulson under ORS 59.115(1)?

C. Is there sufficient evidence to hold Paulson liable for punitive damages on the common-law fraud claim?

D. Did Paulson properly raise its assignments of error in its answering brief?

E. What is the scope of retrial on the common-law fraud claim?

The Oregon Securities Law is found in ORS 59.005 to 59.451. This case involves ORS 59.115(1)[5] and (3).[6]

---

[4] The concluding paragraph of the Court of Appeals' opinion makes no specific reference to the reinstatement of the punitive damages award. 98 Or App at 210. We construe the words "[j]udgment notwithstanding verdict reversed" to include reinstatement of the punitive damages award. *See also* 98 Or App at 209.

[5] ORS 59.115(1) provides:

"A person who sells a security is liable as provided in subsection (2) of this section to a purchaser of the security if the person:

"(a) Sells a security in violation of the Oregon Securities Law or of any condition, limitation or restriction imposed upon a registration or license under the Oregon Securities Law; or

"(b) Sells a security by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading (the buyer not knowing of the untruth or omission), and who does not sustain the burden of proof that the person did not know, and in the exercise of reasonable care could not have known, of the untruth or omission."

[6] ORS 59.115(3) specifically provides for secondary liability of nonsellers as follows:

"Every person who directly or indirectly controls a seller liable under subsection (1) of this section, every partner, officer, or director of such seller, every person occupying a similar status or performing similar functions, and every person who participates or materially aids in the sale is also liable jointly and severally with and to the same extent as the seller, unless the nonseller sustains the burden of proof that the nonseller did not know, and, in the exercise of reasonable care, could not have known, of the existence of the facts on which the liability is based. Any person

ORS 59.115(1)(a) imposes liability against any person who "[s]ells a security in violation of the Oregon Securities Law." ORS 59.115(1)(b) makes a person liable for selling a security "by means of an untrue statement of a material fact." ORS 59.115(3) provides for derivative liability of every nonselling person who (a) "directly or indirectly controls a seller," and (b) "every person who participates or materially aids in the sale." A controlling "nonseller" can escape liability under the exculpatory clause of ORS 59.115(3) if the nonseller "sustains the burden of proof that the nonseller did not know, and, in the exercise of reasonable care, could not have known, of the existence of the facts on which the liability is based."

Paulson asserts that the reference in ORS 59.115(3) to "[e]very person who directly or indirectly controls a seller" was intended to supplant or preempt liability under ORS 59.115(1) based upon *respondeat superior* or principles of agency. The plaintiffs, on the other hand, assert that traditional agency principles apply and, thus, Paulson may be held liable as a seller if it is established that Kennedy and Lambo were "clothed with apparent authority" to act on defendant's behalf.

We turn to a discussion whether Paulson may be held secondarily liable as a principal under ORS 59.115(1).

A.   MAY COMMON-LAW AGENCY PRINCIPLES BE INVOKED TO IMPOSE LIABILITY AS A SELLER AGAINST A PRINCIPAL FOR AN AGENT'S VIOLATION OF ORS 59.115(1)?

This court has stated that the underlying policy of Oregon's securities laws is "to afford the greatest possible protection to the public." *Adamson v. Lang,* 236 Or 511, 516, 389 P2d 39 (1964). ORS 59.115(1) gives rise to a private right of action against a *seller* of securities. *Held v. Product Manufacturing Company,* 286 Or 67, 69-70, 592 P2d 1005 (1979).

ORS 59.115 is a part of a substantial revision of the Oregon Securities Law in 1967. Or Laws 1967, ch 537, § 13(1), (2), (3), (4), (5), (7), *amended by* Or Laws 1985, ch 349, § 13; Or Laws 1987, ch 158, § 10; Or Laws 1987, ch 603, § 6; and

_____

held liable under this section shall be entitled to contribution from those jointly and severally liable with that person."

Or Laws 1989, ch 197, § 5. The legislative history of the Oregon Securities Law sheds no light on the question whether, under ORS 59.115(1), a principal may be held liable as a seller on an agency theory. Nor do any prior decisions of this court address that question.

■ ORS 59.115 is an offspring of federal security laws and regulations going back to the 1930s. The "controlling person" statute, ORS 59.115(3), was drawn from Section 20(a) of the Securities Exchange Act of 1934.[7] In situations involving Oregon laws in large measure drawn from a federal counterpart, it is appropriate to look for guidance to federal court decisions interpreting similar federal laws, even though those decisions do not bind us. *See Karsun v. Kelley,* 258 Or 155, 161, 482 P2d 533 (1971). *See also Computer Concepts, Inc. v. Brandt,* 310 Or 706, 714 n 7, 801 P2d 800 (1990).

In *Hollinger v. Titan Capital Corp.,* 914 F2d 1564 (9th Cir 1990), victimized investors sought to recover losses from a brokerage firm that employed a dishonest securities salesperson. The defendants claimed they could not be held liable as principals under the federal counterpart of ORS 59.115(1). We quote from the opinion.

"Appellants also claim on appeal that the district court erred in granting summary judgment to [the brokerage firm] on appellants' claim that [the brokerage firm] was secondarily liable for [its salesperson's] § 10(b) violation under the common law theory of respondeat superior. Although it has been the law of our circuit that § 20(a) 'supplants vicarious liability of an employer for the acts of an employee applying the respondeat superior doctrine,' [citations omitted,] we now join several other circuits in holding that § 20(a)

---

[7] Section 20(a) of the Securities Exchange Act provides:

"Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." Securities Exchange Act of 1934 § 20(a), 15 USC § 78t(a) (1976).

Section 20(a) was patterned after Section 15 of the Securities Act of 1933. *See* Securities Act of 1933 § 15, 15 USC § 77o (1976), *as amended by* Securities Exchange Act of 1934, Pub L 73-291, § 208; *see also* Comment, *Controlling Person Liability Under the Federal Securities Laws in the Ninth Circuit: Toward a Reconsideration of the Culpable Participation Doctrine,* 69 Or L Rev 337 (1990), for a comprehensive discussion of the legislative history of § 20(a) and § 15.

was intended to supplement, and not to supplant, the common law theory of respondeat superior as a basis for vicarious liability in securities cases.

"In our earlier cases, we had concluded, without much explanation, that § 20(a) supplanted the doctrine of respondeat superior. [Citations omitted.]

"After reexamination of the issue as an en banc court, we are now satisfied that 'the " 'controlling person' " provision of Section 20(a) was not intended to supplant the application of agency principles in securities cases, and that it was enacted to expand rather than to restrict the scope of liability under the securities laws.' *Marbury Management [Inc. v. Kohn]*, 629 F2d [705,] 712 [(2d Cir 1980)]; *accord Paul F. Newton & Co.[v. Texas Commerce Bank]*, 630 F2d [1111], 1118 [(5th Cir 1980)] (The legislative 'history does not reflect any congressional intent to restrict secondary liability for violations of the acts to the controlled persons formula.').

"Section 20(a), which was modelled after the controlling person provision of § 15 of the Securities Act of 1933, 15 U.S.C. § 77o, was intended 'to prevent evasion' of the law 'by organizing dummies who will undertake the actual things forbidden.' In other words, § 20(a) was intended to impose liability on controlling persons, such as controlling shareholders and corporate officers, who would not be liable under respondeat superior because they were not the actual employers. Thus, in enacting § 20(a), Congress expanded upon the common law, and in doing so, created a defense (the good faith defense) that would be available only to those who, under common law principles of respondeat superior, would have faced no liability at all.

"Only if both respondeat superior and § 20(a) are available is the statutory scheme comprehensive and the public protected by the federal securities laws. 'To allow a brokerage firm to avoid secondary liability simply by showing ignorance, purposeful or negligent, of the acts of its registered representative contravenes Congress' intent to protect the public, particularly unsophisticated investors, from fraudulent practices.' *Paul F. Newton & Co., supra,* 630 F.2d at 1118-19. When both remedies are available, then the agent who personally committed the wrong is primarily liable (based on proof of his actions or omissions, and on scienter when required); the principal who acts through the agent (assuming the agent is acting within the scope of his agency) is secondarily liable; and other persons who are not subject to

respondeat superior but who nevertheless control the wrong-doer can be held liable under § 20(a). Because the liability of persons under § 20(a) represents an extension of liability, beyond that imposed by the common law, such persons are afforded statutory defenses not available in the principal-agent context. Controlling persons may thus avoid liability under § 20(a) by demonstrating that they acted in 'good faith' within the meaning of that section." 914 F2d at 1576-78 (footnotes omitted).

The Court of Appeals' analysis in *Hollinger* is clear and logical and manifestly consistent with the aim of the Oregon Securities Law. For the reasons expressed in that opinion, we too reach the conclusion that principles of agency are available to impose liability against nonsellers under ORS 59.115(1).

We turn then to the second issue, whether there is sufficient evidence to impose liability on Paulson on the theory that Kennedy and Lambo, although exceeding their actual authority, acted with apparent authority.

B. IS THE EVIDENCE OF AN APPARENT AGENCY RELATIONSHIP BETWEEN PAULSON AND KENNEDY AND LAMBO SUFFICIENT TO IMPOSE LIABILITY ON PAULSON UNDER ORS 59.115(1)?

We examine the evidence in the light most favorable to the plaintiffs, in whose favor the verdict was rendered. *Yamaha Store of Bend, Inc. v. Yamaha Motor Corp.*, 310 Or 333, 337, 798 P2d 656 (1990); *Katter v. Jack's Datsun Sales, Inc.*, 279 Or 161, 163, 566 P2d 509 (1977).

The plaintiffs seek to impose liability on Paulson for Kennedy's and Lambo's conduct on the following principle, as stated in the plaintiffs' brief:

"Where a principal has, by his voluntary acts, placed an agent in such a situation that a person of ordinary prudence is justified in assuming that such agent has authority to perform a particular act and deals with the agent upon that assumption, the law does not permit the principal to claim that the agent was not authorized or even was prohibited from performing the act."

■     This agency theory, applicable when an agent acts in excess of his or her actual authority but with the appearance of authority, is commonly referred to as "apparent authority." Apparent authority is created

> "only by some conduct of the principal which, when reasonably interpreted, causes a third party to believe that the principal consents to have the apparent agent act for him on that matter. The third party must also rely on that belief." *Mattson v. Commercial Credit Business Loans,* 301 Or 407, 422, 723 P2d 996 (1986) (*quoting Jones v. Nunley,* 274 Or 591, 595, 547 P2d 616 (1976)).[8]

■     "Apparent authority" involves a different association between the principal and the agent than "implied authority," although both are relationships based on principles of agency. *See* Restatement (Second) Agency § 8, *comment a* at 30-31 (1958). Implied authority arises when an agent, to whom the principal has given direct authorization to complete a particular act on behalf of the principal, performs acts incidental to the authorized endeavor, and the authority to perform those incidental acts is inferred from the original grant of authority. *See Young v. Neill et al,* 190 Or 161, 174, 220 P2d 89, 225 P2d 66 (1950); *see also Wiggins v. Barrett & Associates, Inc.,* 295 Or 679, 687, 669 P2d 1132 (1983).

■■     Apparent authority, on the other hand, arises when the agent does not possess the actual or implied authority to act for the principal in the matter, but "the principal has clothed the agent with apparent authority to act for the principal in that particular. In other words, the principal permits the agent to appear to have the authority to bind the principal." *Wiggins v. Barrett & Associates, Inc., supra,* 295 Or at 687.[9] Either of these agency relationships can bind the

---

[8] Restatement (Second) Agency § 27, at 103 (1958), sets forth this black letter rule:

"Except for the execution of instruments under seal or for the conduct of transactions required by statute to be authorized in a particular way, apparent authority to do an act is created as to a third person by written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him."

[9] Restatement (Second) Agency § 27, *comment a* at 104 (1958), states:

"For apparent authority there is the basic requirement that the principal be responsible for the information which comes to the mind of the third person * * *. Thus, either the principal must intend to cause the third person to believe that the

principal, creating liability for the acts of the agent. In the present case, the plaintiffs maintain that when Kennedy and Lambo sold the securities, Kennedy and Lambo were acting within their apparent authority.

In order for Paulson to be bound by Kennedy's and Lambo's conduct towards the plaintiffs on the theory of apparent authority, it must be shown that:

1. Paulson provided information to the plaintiffs that was either intended to cause the plaintiffs to believe that Kennedy and Lambo were authorized to act for Paulson, or Paulson should have realized that its conduct was likely to create such belief; and

2. From information provided by Paulson, or from the conduct of Paulson, the plaintiffs reasonably believed that Kennedy and Lambo were authorized to act for Paulson.

■ There is sufficient evidence to support a finding that Kennedy and Lambo were acting within the apparent authority of Paulson. Paulson is a broker-dealer and investment adviser selling securities in Oregon. Kennedy and Lambo were employed by Paulson as registered representatives. Kennedy and Lambo previously were employed by another securities firm, T.E. Slanker, which went out of business. When Kennedy went to work for Paulson, it sent its customers letters announcing Kennedy's association with Paulson. A second letter was sent a short time later to announce the assignment of Kennedy to several ongoing customer accounts. With these announcements, Paulson, who did not

---

agent is authorized to act for him, or he should realize that his conduct is likely to create such belief. The information received by the third person may come directly from the principal by letter or word of mouth, from authorized statements of the agent, from documents or other indicia of authority given by the principal to the agent, or from third persons who have heard of the agent's authority through authorized or permitted channels of communication. Likewise, * * * apparent authority can be created by appointing a person to a position, such as that of manager or treasurer, which carries with it generally recognized duties; to those who know of the appointment there is apparent authority to do the things ordinarily entrusted to one occupying such a position, regardless of unknown limitations which are imposed upon the particular agent. So, too, a person who permits another to do an act in such a way as to establish in a community a reputation for having authority to act, either by directing the agent so to represent, or by directing him to act and doing nothing to prevent the spread of such information by the agent or by others, creates apparent authority with respect to those who learn of the reputation."

inform its customers of any limitations on Kennedy's authority to act for Paulson, conferred on Kennedy the authority to represent Paulson in securities sales and investment transactions.

Following the announcements, conduct evincing a grant of authority continued. Kennedy's written communications with the plaintiffs concerning the securities were on Paulson's stationery, signed by Kennedy, and mailed by Lambo. Information regarding the securities was often enclosed by Lambo in these communications, along with information on securities approved by Paulson.

Sales presentations touting the securities involved in this case were made by Kennedy and Lambo. The sales presentations occurred on Paulson's premises, and on at least one occasion, during normal business hours. Furthermore, both Kennedy and Lambo received calls regarding the securities at Paulson's place of business.

At no time were any of the plaintiffs notified that the sale of the securities had not been approved by Paulson or that Kennedy and Lambo were acting solely on their own behalf. There is evidence that Paulson provided information intended to cause third persons to believe that Kennedy and Lambo were authorized to act for it in matters pertaining to the sale of securities, including meeting with customers, making sales presentations, sending mailings and handling paperwork. Although Paulson may have forbade its sales representatives to present or sell nonapproved securities, liability based on the agency principle of apparent authority may be imposed even though the principal expressly forbade the conduct in question. *See McClure v. E.A. Blackshere Company*, 231 F Supp 678, 685 (D Md 1964).

There is also evidence that from the information provided to them by Paulson, the plaintiffs reasonably believed that Kennedy and Lambo were authorized to act for Paulson concerning the securities sold by Kennedy and Lambo to the plaintiffs. The investors testified to their reliance on this apparent authority.

The evidence is sufficient to support the jury's verdict that Kennedy and Lambo conducted the illegal sales with the apparent authority of Paulson. Paulson, therefore, is

liable as a principal for the plaintiffs' damages. The trial court erred in granting judgment notwithstanding the verdict to Paulson. The judgment on the claim for damages under ORS 59.115(1)(a) and (b) must be reinstated.[10]

The jury also held Paulson liable for punitive damages on the common-law fraud claim. We turn to the question whether the evidence was sufficient to impose liability for punitive damages.

## C.   IS THERE SUFFICIENT EVIDENCE TO HOLD PAULSON LIABLE FOR PUNITIVE DAMAGES ON THE COMMON-LAW FRAUD CLAIM?

In *Gill v. Selling et al*, 125 Or 587, 267 P 812, 126 Or 584, 270 P 411 (1928), a verdict for punitive damages was returned against a doctor. The doctor was found liable on an agency law theory for the conduct of his associates who negligently performed a spinal procedure on the wrong patient. The doctor did not participate in the procedure, nor did he have any knowledge that the procedure was to take place. On appeal, the court held that the evidence did not support any finding other than mere negligence, and that the issue of punitive damages should have been withdrawn from the jury's consideration. Quoting *Sullivan v. Oreg. Ry. & N. Co.*, 12 Or 392, 406, 7 P 508 (1885), with approval, the *Gill* court stated the rule as follows:

> "The master is liable for such damages when he is chargeable with gross neglect in the employment or retention in his service of an incompetent servant, knowing at the time of his unsuitability, or that he authorized or ratified the act of the servant in the particular case." 125 Or 593-94.

*Accord Fuller v. Blanc*, 160 Or 50, 58, 77 P2d 440, 83 P2d 434 (1938) ("In this jurisdiction a principal cannot be held in punitive damages for the act of his agent committed without his knowledge and without ratification by the principal").

---

[10] The plaintiffs also sought damages against the defendant as a controlling person and as one who materially aided in the sale of the securities. By special verdicts, the jury found the defendant liable under all three theories — apparent authority, controlling person and materially aiding. We do not need to reach the "control" or "aiding" issues, because the same damages are recoverable under each theory. ORS 59.115(2)(a).

There is no evidence that Paulson was aware of, approved of, ratified, or countenanced Kennedy's or Lambo's misconduct. The relevant sales were not recorded in Paulson's books. Paulson received no money from and paid no commissions on the sales. The sales were outside the scope of Kennedy's and Lambo's actual or implied authority and were purely personal dealings.

In reinstating the award of punitive damages against Paulson, the Court of Appeals relied on *Stroud v. Denny's Restaurant,* 271 Or 430, 437, 532 P2d 790 (1975), and stated:

> "We have held that the scope of employment includes acts of an agent that are within the apparent authority of the agent, if a third person acted in reliance on the apparent authority. *Seiders v. Hefner,* 89 Or App 55, 747 P2d 1003 (1987), *rev den* 305 Or 576 (1988). There was evidence to support the jury's finding that Lambo acted with the apparent authority of Paulson and its implicit finding on the fraud claim that plaintiffs relied on Lambo's apparent authority as an agent of Paulson in purchasing the securities." *Badger v. Paulson Investment Co., Inc., supra,* 98 Or App at 209.

■■ In *Stroud,* this court affirmed a punitive damages award against an employer because its employee was "acting within the scope of his employment." 271 Or at 437. A finding of apparent authority is not the equivalent of a finding of acting within the scope of employment. There is no reason to impose punitive damages against a principal whose agent is not acting within the scope of the agency, particularly where, as here, there is no evidence that Paulson knew of Kennedy's and Lambo's chicanery.

■ The prerequisite for imposition of punitive damages is a degree of culpability greater than inattention or simple negligence. *Andor v. United Air Lines,* 303 Or 505, 511-13, 739 P2d 18 (1987); *see also Honeywell v. Sterling Furniture Co.,* 310 Or 206, 210, 797 P2d 1019 (1990). The defendant-principal in *Gill,* like Paulson in the case at bar, did not know of or ratify the misconduct of his agents. The court noted that

> "[i]f [punitive damages] are to be awarded at all, it would seem that, however much they may be justified against the guilty servant or agent himself, they should not be awarded against the principal or master unless it can be shown that in some way he also has been guilty of the wrongful motives

upon which such damages are based." *Gill v. Selling, supra,* 125 Or at 594 (quoting 2 Mechem on Agency, Section 2014).

In the present case, Paulson may have been negligent. But the lack of any evidence that Paulson had knowledge of Kennedy's and Lambo's wrongdoing precludes any finding of culpability to support a punitive damages award.[11] The Court

---

[11] As stated in footnote 10, *supra,* we did not consider the claims of error relevant to the "control" or "aiding" allegations under ORS 59.115(3) because the same damages were recoverable under ORS 59.115(1)(a). True, by special verdict, the jury found that Paulson did "directly or indirectly control Kennedy and/or Lambo," that Paulson did "participate or materially aid in the sale of [the] securities," and that Paulson knew or should have known that Kennedy and/or Lambo were selling the securities.

Under the trial court's instructions, the jury could have found that Paulson "participated or materially aided" in the sales of unregistered securities by finding that Paulson was no more than negligent. The instructions relative to "participates or materially aided" were as follows:

"In order to prevail on the theory of participating or materially aiding each plaintiff must prove by a preponderance of the evidence that Paulson participated or materially aided in the sale to that plaintiff.

"A broker/dealer has the duty to use that degree of care, skill and diligence which is used by ordinarily careful broker/dealers practicing in the securities industries under the same or similar circumstances. A failure to use such care, skill or diligence is a failure to meet the standards in the securities industry.

"A broker/dealer conducting sales through registered representatives participates or materially aids in a sale if the broker/dealer fails to exercise reasonable care to discover or prevent the sales in one or more of the following particulars:

"A, in failing to make or communicate any proper regulations you find to have been established by the evidence and these instructions.

"B, in failing to supervise the activities of its registered representative, or

"C, in permitting or failing to prevent wrongful conduct by persons upon premises or with instrumentalities under the broker/dealer's control, whether or not the persons committing the wrongful acts were employees.

"If you find from the evidence and the instructions that plaintiffs have proven that Paulson is a person who directly or indirectly participated or materially aided Lambo and/or Kennedy, then Paulson is liable unless Paulson sustains its burden of proof by a preponderance of the evidence. That it did not know and in the exercise of reasonable care could not have known that Lambo and/or Kennedy were selling the securities."

Under these instructions — we express no opinion whether the instructions were correct — the jury could have found Paulson liable as one who participated or materially aided by finding no more than simple negligence. That degree of culpability will not support an award of punitive damages.

On the allegations that Paulson "directly or indirectly controlled" Lambo and/or Kennedy, the jury was instructed:

"In order for plaintiffs to prevail upon this theory, each plaintiff must prove by a preponderance of the evidence that Paulson was a person who directly or indirectly controlled Lambo and/or Kennedy.

"Control means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person whether by contract or otherwise.

of Appeals erred in reinstating the award of punitive damages against Paulson.

One major issue, relating to Paulson's assigning as error the giving of certain jury instructions and the failure to give Paulson's proposed jury instructions, remains.

## D. DID PAULSON PROPERLY RAISE ITS ASSIGNMENTS OF ERROR IN ITS ANSWER-ING BRIEF?

At the conclusion of the evidence, Paulson moved for a directed verdict on the plaintiffs' securities claims. After stating that the motion would be granted, the trial judge, on the plaintiffs' request, and over the objection of Paulson, submitted the case to the jury pursuant to ORCP 63 B.[12] The judge made clear, however, that should the jury return a verdict in plaintiffs' favor, he would grant Paulson's motion for judgment notwithstanding the verdict. To that end, the judge stated:

> "[I]'ll allow this to go to the jury [and then] I'll take it away.
>
> "* * * [S]o in effect I'm denying these motions for the finding as a matter of law only for the purpose of going to a jury. And if the jury comes back and doesn't give you anything, you've had your day in court. But if they come back and allow something on that why, I'll take it away on a motion there because I don't feel that it's the law."

---

"Paulson is a person as that word is used throughout these instructions.

"If you find from the evidence and the instructions that plaintiffs have proven that Paulson is a person who directly or indirectly controlled Lambo and/or Kennedy, then Paulson is liable unless Paulson sustains its burden of proof by a preponderance of the evidence that it did not know and in the exercise of reasonable care could not have known that Lambo and/or Kennedy was selling the securities to each plaintiff."

Under these instructions — the correctness of which we express no opinion — the jury could have found control under nothing more than "the power to direct or cause the direction of the management and policies of a person." Such a finding is insufficient to support an award of punitive damages.

[12] ORCP 63 B provides:

"In any case where, in the opinion of the court, a motion for a directed verdict ought to be granted, it may nevertheless, at the request of the adverse party, submit the case to the jury with leave to the moving party to move for judgment in such party's favor if the verdict is otherwise than as would have been directed or if the jury cannot agree on a verdict."

The jury did return a verdict for the plaintiffs on all claims. Paulson filed a motion for judgment notwithstanding the verdict, which was granted. Paulson did not move, in the alternative, for a new trial.

In its answering brief, Paulson made this contention:

"If this court concludes that the trial court erred in granting defendant Paulson's motion for [a judgment notwithstanding the verdict] on plaintiffs' securities claims, defendant Paulson is entitled to a new trial based on erroneous jury instructions."

The plaintiffs maintain that because Paulson did not file a notice of cross-appeal, we should not entertain Paulson's assertion that it is entitled to a new trial due to the giving of erroneous jury instructions.

The Court of Appeals, relying on suggestions made in *Artman v. Ray,* 263 Or 529, 501 P2d 63, *reh den* 502 P2d 1376 (1972), held that Paulson was required to cross-appeal on the issue of a new trial because "[Paulson's] arguments, if successful, would not result in an affirmance of the judgment; the case would have to be remanded for a new trial." *Badger v. Paulson Investment Co., Inc., supra,* 98 Or App at 209.

The alleged erroneous instructions, which defendant argues entitle it to a new trial if the judgment notwithstanding the verdict is reversed, are pertinent to the securities claims only under the theories of "controlling person" liability and "materially aiding and abetting" liability. The instructions enumerated by the defendant as inaccurate, and thereby failing to "instruct the jury on the relevant principles of law," do not affect the defendant's liability under ORS 59.115(1).[13] Therefore, we do not reach the question whether the defendant was required to raise these assignments of error by cross-appeal.

E.    WHAT IS THE SCOPE OF RETRIAL ON THE COMMON-LAW FRAUD CLAIM?

We address one last issue. On the plaintiffs' fraud claim, the jury returned special verdicts against defendant Paulson for $1 and against Kennedy and Lambo for larger sums. The plaintiffs assigned error to the receipt of the verdicts. The Court of Appeals held that because the liability

---

[13] *See* footnote 10, *supra.*

of principal and agent is joint and several the verdict was "insufficient." 98 Or App at 207. The Court of Appeals ordered that "the error must be corrected on remand by a new trial on the question of special damages * * *." *Ibid.*

Paulson does not petition for review of the order granting a new trial, and we do not review that order. Paulson reads the Court of Appeals' opinion to mean that the retrial on the fraud claim be "only on damages." We do not so read the Court of Appeals' opinion. The fraud claim must be retried in its entirety (except for punitive damages).

The decision of the Court of Appeals is affirmed in part and reversed in part. The judgment notwithstanding verdict is reversed in part; the jury verdicts for plaintiffs on the sale of unregistered securities and securities fraud claims are reinstated and remanded for entry of judgment on the verdicts; the circuit court's order setting aside the judgment for punitive damages is affirmed; remanded for new trial on common-law fraud claim only and for entry of a judgment for costs and attorney fees for plaintiffs against defendant Fidelity and Deposit Company of Maryland; otherwise the circuit court is affirmed.