Argued and submitted December 22, 2006, on appeal, affirmed; on cross-appeal, reversed and remanded for entry of judgment in favor of cross-appellant October 31, 2007

H. H. TAYLOR,
C. A. Taylor,
and Taylor & Taylor, Inc.,
an Oregon corporation,
*Plaintiffs-Appellants,*
*Cross-Respondents,*

*v.*

RAMSAY-GERDING CONSTRUCTION COMPANY,
an Oregon corporation,
*Defendant,*

*and*

CHEMREX, INC.,
a foreign corporation,
*Defendant-Respondent,*
*Cross-Appellant.*

RAMSAY-GERDING CONSTRUCTION COMPANY,
an Oregon corporation,
*Third-Party Plaintiff,*

*v.*

TFC ENTERPRISES, INC.,
an Oregon corporation,
dba Finishers Drywall;
ChemRex, Inc.,
a foreign corporation;
Century West Engineering Corporation,
an Oregon corporation;
Wyatt Architects and Associates, P.S.;
and Donald Trail,
*Third-Party Defendants.*

Lincoln County Circuit Court
015188; A127434

172 P3d 251

James N. Westwood argued the cause for appellants - cross-respondents. With him on the brief were Stoel Rives LLP, David A. Hilgemann, and Law Offices of David A. Hilgemann.

Todd S. Baran argued the cause and filed the briefs for respondent - cross-appellant.

Ralph C. Spooner, Melissa J. Ward, and Spooner & Much, P.C., filed the brief *amicus curiae* for defendant Ramsay-Gerding Construction Company.

Before Schuman, Presiding Judge, and Landau* and Ortega, Judges.

ORTEGA, J.

---

* Landau, J., *vice* Riggs, S. J.

**ORTEGA, J.**

Plaintiffs H. H. and C. A. Taylor own a hotel in Lincoln City. Plaintiff Taylor & Taylor Development Company operates the hotel.[1] Plaintiffs sued ChemRex, Inc.,[2] for breach of warranty based on the alleged failure of an exterior stucco system that was manufactured by ChemRex and installed during construction of the hotel under the supervision of the general contractor on the hotel construction project.[3] The Taylors sought as damages the costs of repairing the building. The development company sought consequential damages resulting from closure of the hotel during repairs. The jury determined that the development company failed to file its breach of warranty claim within the applicable statutory limitations period. As pertinent to this appeal, the jury also determined that ChemRex breached one or more express warranties to the Taylors, that the Taylors incurred damages of $775,000 as a result of the breach, that the Taylors were negligent in one or more of the ways alleged in ChemRex's answer, that their negligence was a cause of their damages, and that ChemRex was 51 percent at fault and the Taylors were 49 percent at fault. The trial court entered a limited judgment awarding the Taylors $395,250 and dismissing the development company's claim.

---

[1] References in this opinion to "plaintiffs" are to H. H. and C. A. Taylor and Taylor & Taylor Development Company collectively. References to "the Taylors" are to the individual plaintiffs, that is, plaintiffs H. H. and C. A. Taylor. H. H. Taylor is known as Todd Taylor, and references to him in the evidentiary record typically use that name; when referring to him in his individual capacity, we do likewise. C. A. Taylor is known as Charlotte Taylor, and references to her in the evidentiary record typically use that name; we do likewise when referring to her in her individual capacity. We refer to the corporate plaintiff, Taylor & Taylor Development Company, as "the development company."

[2] By the time of trial, ChemRex was known as Degussa Building Systems, Inc.

[3] As discussed in greater detail below, plaintiffs also sued Ramsay-Gerding Construction Company, the general contractor on the hotel construction project, and Ramsay-Gerding in turn brought third-party claims, including a claim for breach of express warranty, against ChemRex, as well as claims against the other third-party defendants. Plaintiffs' and Ramsay-Gerding's claims against ChemRex for breach of warranty were bifurcated for trial in advance of the parties' remaining claims and third-party claims. The judgment in this case disposed of only plaintiffs' breach of warranty claims against ChemRex, and this appeal concerns only that judgment. Ramsay-Gerding has filed a brief *amicus curiae* in this appeal.

By the time of trial, Ramsay-Gerding was known as T. Gerding Construction.

On appeal, plaintiffs assign error to the trial court's submission to the jury of ChemRex's comparative fault defense and its failure to dismiss ChemRex's statute of limitations defense against the development company's claim. ChemRex cross-assigns error to the trial court's denial of its motion for a directed verdict in its favor on the development company's claim. ChemRex also cross-appeals, assigning error to the trial court's denial of its motion for a directed verdict in its favor on the Taylors' claim; to the trial court's denial of its motion for judgment on the pleadings in its favor based on its statute of limitations defense against the Taylors' claim; to its entry of a judgment that did not conform to the jury's verdict; and to its order of bifurcation. We affirm on the appeal and reverse on the cross-appeal.

## I.  BACKGROUND

The relevant historical and procedural facts are undisputed. The Taylors own the O'Dysius Hotel in Lincoln City. They are the only shareholders of the development company, which operates the hotel. Ramsay-Gerding Construction Company was general contractor for construction of the hotel.

Ramsay-Gerding hired TFC Enterprises, Inc. (TFC), to install the hotel's plaster stucco exterior siding and accompanying metal accessories. TFC submitted to Ramsay-Gerding a request to install a "SonoWall" exterior stucco finish system that was manufactured by ChemRex. The request was approved, and stucco application commenced at the end of August 1998.

About two weeks later, Todd Taylor called Thomas Gerding of Ramsay-Gerding to inform him of a concern that the galvanized metal accessories included in the ChemRex stucco system would rust under coastal conditions. Taylor also followed up with a letter. Gerding stopped work on the installation.

In September 1998, a meeting was held at the construction site. Todd Taylor continued to assert that galvanized metal would rust in Lincoln City's climate. A ChemRex sales representative, McDonald, asserted that the SonoWall system was bullet-proof against rust, noted that the system

came with a five-year warranty, and added that an extra-cost rust inhibitor coating would provide further protection against rust. Taylor and McDonald agreed to proceed with the installation, with the addition of the rust inhibitor coating.

Ten months later, in July 1999, McDonald sent a letter to TFC, stating that ChemRex would "warrantee the SonoWall stucco system for five years * * * starting in [M]arch of 1999." McDonald intended the warranty to extend to the Taylors.

There was evidence that an employee of the development company discovered that the galvanized metal on the roof was rusting in the late summer or early fall of 1999 and, in March or April of the following year, evidence of rust appeared on the exterior, on corners, and on some expansion joints. On July 20, 2000, Todd Taylor wrote to Gerding about the problem, invoking the five-year ChemRex warranty. On August 2, 2000, Gerding informed Taylor that representatives from ChemRex and TFC would be at the hotel on August 4. On August 24, Taylor informed Gerding by letter that the meeting had occurred but that he had not heard from ChemRex since that time. As of 2004, the problem had not been fixed.

## II. THE TRIAL

In October 2001, the Taylors initiated an action against Ramsay-Gerding for breach of the construction contract, seeking damages for repair of the building and for lost profits due to its "unattractive" condition and the necessity of making repairs. Ramsay-Gerding answered and, as an affirmative defense, asserted in part that the Taylors were negligent in selecting the stucco system.

In April 2002, Ramsay-Gerding initiated its third-party complaint against ChemRex, among other entities involved in the construction of the hotel. Ramsay-Gerding alleged that ChemRex had been negligent in designing the system and in other particulars and that it had breached its warranty pertaining to the system. It also sought indemnity and contribution from ChemRex for any damages awarded to the Taylors against Ramsay-Gerding. ChemRex answered,

asserting as an affirmative defense that the Taylors' damages were caused by their own fault or negligence or that of others involved in the construction.

In August 2003, the Taylors and Ramsay-Gerding stipulated to the Taylors' filing of an amended complaint. The complaint, which was filed on August 8, asserted claims against Ramsay-Gerding for breach of contract and negligence and asserted a claim against ChemRex for breach of express warranty. As to the latter, the Taylors alleged that ChemRex had warranted the stucco system and related materials for five years beginning in March 1999 and that, within two years of completion of construction, the system began to rust and stain the building. The Taylors sought economic damages in an amount pertaining to the repair of the building and consequential damages for lost profits. ChemRex moved to strike the amended complaint on the ground that the Taylors had not obtained leave of the court or ChemRex's consent to file it, but the trial court denied that motion.

In April 2004, plaintiffs filed a second amended complaint, adding the development company as a plaintiff. Plaintiffs again asserted breach of contract and negligence claims against Ramsay-Gerding and a breach of express warranty claim against ChemRex. As to the latter claim, plaintiffs alleged that ChemRex representatives warranted to them, both orally and in writing, that the SonoWall stucco system would prevent rust from occurring in the exterior siding of the hotel building; that, consistently with ChemRex's recommendation, plaintiffs applied an additional rust preventative; that ChemRex expressly warranted the system for five years beginning in March 1999; that, less than two years later, the sidings and flashings began to rust and stain the siding; that plaintiffs notified ChemRex representatives of that fact and demanded correction of the problem; and that ChemRex did not correct the problem. Plaintiffs sought economic damages in the amount of $1,100,000 for repair and remediation and consequential damages in an amount not less than $500,000 for lost business profit.[4]

---

[4] On August 3, 2004, the day after the jury returned the special verdicts, plaintiffs filed a third amended complaint. The second amended complaint was the operative complaint.

That same month, Ramsay-Gerding moved to bifurcate the trial of plaintiffs' and its own breach of warranty claims against ChemRex from other claims asserted by the parties. Plaintiffs joined in the motion.

ChemRex's answer to plaintiffs' second amended complaint asserted several affirmative defenses, including the defenses that plaintiffs' claim was "barred by warranty limitations," that the damages alleged by plaintiffs were caused in whole or in part by the fault or negligence of plaintiffs or their agents, that plaintiffs' claim was time barred, that plaintiffs had failed to mitigate their damages, and that their claim for consequential business losses was barred by the economic loss doctrine. ChemRex asserted similar affirmative defenses to Ramsay-Gerding's third-party claims for negligence and breach of warranty.

In May 2004, a hearing was held on plaintiffs' and Ramsay-Gerding's motion to bifurcate their breach of express warranty claims. Ramsay-Gerding contended that trial of those claims would not require the presence of the engineering and architectural firms, which were named only in the third-party complaint for indemnity and contribution purposes; it argued that the trial on the breach of warranty claims therefore would be "significantly shorter" yet would resolve "probably 90 percent" of plaintiffs' case. ChemRex responded in part that it was appropriate, indeed necessary, to try all of the claims together, because plaintiffs were asserting construction defects as well as product defects, because ChemRex was asserting cross-claims for indemnity and contribution against the design professional and Ramsay-Gerding as provided in ORCP 22 B, and because all of the same witnesses and evidence would be relevant to all of the claims. Ramsay-Gerding replied in part that comparative fault was not a defense to a breach of warranty claim; plaintiffs joined in that assertion. The trial court granted the motion to bifurcate the breach of express warranty claims.

The bifurcated claims were tried in July and August 2004. Before trial on the warranty claims, Ramsay-Gerding moved *in limine* to exclude any evidence of construction defects that were not related to the exterior stucco system, on the grounds that plaintiffs' complaint did not seek warranty

damages for alleged defects that were not part of that system and that the "concept of the comparative fault or negligence of the contractor would not be a defense" to those warranty claims. ChemRex opposed the motion, contending that it had significant evidence of other construction-related defects that may have caused the problems with the stucco system, including improper installation of weather barriers, flashings, and windows; that, in addition, those defects provided the "motivation" for Ramsay-Gerding to join plaintiffs in seeking to have the stucco removed; and that holding ChemRex solely responsible for the problems with the stucco system would unfairly shift to it the responsibility for those other construction defects. Plaintiffs did not expressly join or argue in favor of the motion, which the trial court denied.

At trial, plaintiffs' theory was that the rusting of the galvanized metal fittings installed as part of the stucco system caused the damage to the building. ChemRex asserted the defense theory that other construction defects caused the water leaks and resulting damage.

At the close of the evidence, ChemRex moved for a directed verdict on plaintiffs' breach of warranty claims on various grounds, including statute of limitations grounds and the ground that there was insufficient evidence from which a jury could find that McDonald was authorized to issue a warranty on the stucco system or that plaintiffs relied on such a warranty as a basis of their bargain to purchase the system. The trial court denied those motions. As to McDonald's authority to grant a warranty, the trial court concluded that there was no evidence of express or implied authority but submitted to the jury the issue of whether McDonald had apparent authority to provide such a warranty on behalf of ChemRex. At ChemRex's request, the trial court gave the jury several instructions relating to ChemRex's comparative fault defense.

The jury ultimately returned three special verdicts. In the first, it found that ChemRex had breached one or more express warranties to the Taylors, causing them damages in the amount of $775,000; that the Taylors were negligent in one or more of the ways alleged in ChemRex's answer; and that the Taylors' percentage of fault was 49 percent and

ChemRex's was 51 percent. In its second special verdict, the jury found that the development company did not file its breach of warranty claim within the time provided by law. In its third special verdict, the jury found that ChemRex had breached one or more express warranties to Ramsay-Gerding, that Ramsay-Gerding was negligent, and that Ramsay-Gerding's percentage of fault was 35 percent, ChemRex's was 35 percent, and the Taylors' was 30 percent.

The parties submitted arguments to the court regarding the correct amount of the judgment to be awarded to the Taylors, disputing whether the amount of damages found by the jury was subject to a reduction based on plaintiffs' or Ramsay-Gerding's comparative fault. On December 8, 2004, the trial court entered a limited judgment for the Taylors in the amount of $395,250, that is, 51 percent of the total amount of the Taylors' damages of $775,000.

ChemRex later moved for judgment notwithstanding the verdicts in favor of the Taylors and Ramsay-Gerding. Plaintiffs, in turn, moved for a new trial on the grounds that the development company's claim was not barred by the statute of limitations and that the trial court had erroneously submitted to the jury the issue of their comparative fault. The trial court denied those motions.

### III. THE APPEAL AND CROSS-APPEAL

As noted, plaintiffs now appeal, and ChemRex cross-assigns error and cross-appeals. Plaintiffs assign error to the trial court's submission to the jury of ChemRex's comparative fault defense and its failure to rule as a matter of law that the development company's breach of warranty claim was timely. ChemRex cross-assigns error to the trial court's denial of its motion for a directed verdict on the development company's claim. Finally, on cross-appeal, ChemRex assigns error to the trial court's denial of its motion for a directed verdict on the Taylors' breach of warranty claim; to its denial of ChemRex's motion for judgment on the pleadings based on its statute of limitations defense against the Taylors' claim; to its entry of a judgment that was inconsistent with the jury's verdict; and to its order of bifurcation. We consider those issues in the order of their significance to our disposition of the case as a whole.

Because our disposition of ChemRex's first assignment of error on cross-appeal obviates the need to consider other assignments of error pertaining to the judgment in favor of the Taylors, we begin with that assignment. ChemRex contends that the trial court erred in denying its motion for a directed verdict on the Taylors' breach of warranty claim. According to ChemRex, it was entitled to such a verdict because evidence was lacking from which a jury could find that its representative, McDonald, had apparent authority to give a warranty on the stucco system. Specifically, relying on *Badger v. Paulson Investment Co., Inc.*, 311 Or 14, 803 P2d 1178 (1991), ChemRex argues that, in order for apparent authority to arise, a principal must do something to cause a third person reasonably to believe that an agent has authority to bind the principal as to a particular transaction. ChemRex contends that the record lacks evidence of any such conduct on its part, other than its conferral on McDonald of the title of territory sales manager; that "that title does not automatically convey any particular degree of authority"; and that, even assuming that the title is a term of art in the construction trade that connotes warranty authority, plaintiffs failed to produce any evidence of such a connotation or their awareness of it. According to ChemRex, the record shows that, before the September 1998 meeting, the Taylors had never met McDonald and had never received any information from ChemRex concerning McDonald specifically or the authority of its sales representatives generally. Indeed, ChemRex argues that there is no evidence in the record that the Taylors were even aware of McDonald or ChemRex before the meeting. Finally, ChemRex contends, based on *Hanson v. Signer Motors, Inc.*, 105 Or App 74, 803 P2d 1207 (1990), that the written warranty that McDonald provided after the meeting did not fill any of those gaps and could not have been sufficient in any event because it came after the purchase of the stucco system.

Relying on *Start v. Shell Oil Co. and Arnston*, 202 Or 99, 118, 260 P2d 468, *on reh'g*, 273 P2d 225 (1954), plaintiffs respond that it is a jury question whether a selling agent has authority to give a warranty as an incident of his primary area of responsibility. Plaintiffs contend that there is evidence to support such a finding here, including the fact that

McDonald was listed on ChemRex's activity log as the selling agent for the stucco system and the fact that McDonald's written warranty was on ChemRex letterhead stationery. According to plaintiffs, that conduct, reasonably interpreted, caused them to believe that McDonald was authorized by ChemRex to issue the warranty.

ChemRex replies that *Start* concerned implied authority, which is a form of actual authority, and that plaintiffs do not pursue on appeal their earlier contention that McDonald had that category of authority.[5] As to apparent authority, ChemRex again contends that only actions of the principal can create apparent authority and that the record lacks sufficient evidence of such actions here. Moreover, ChemRex contends that the written warranty, which was not issued until after the project was completed, was insufficient because it could not have been the basis of plaintiffs' reliance on McDonald's warranty; furthermore, although the letter was written on corporate letterhead stationery, it was authored and sent by McDonald, and nothing in the text of the letter indicated that ChemRex had directed him to send it.

In determining whether the trial court correctly denied ChemRex's motion for a directed verdict on the issue of McDonald's apparent authority to give the warranty that is the basis for plaintiffs' express warranty claims, we examine the evidence and all inferences that can be drawn from it in the light most favorable to them as the nonmoving party. *Boothby v. D.R. Johnson Lumber Co.*, 184 Or App 138, 144, 55 P3d 1113 (2002), *aff'd*, 341 Or 35, 137 P3d 699 (2006). We will not set aside a jury's verdict unless we can affirmatively say that there is no evidence from which the jury could have found the facts necessary to establish the elements of the plaintiff's claim. *Brown v. J. C. Penney Co.*, 297 Or 695, 705, 688 P2d 811 (1984). Viewed in that light, the evidence in this case did not provide the jury with a legally sufficient basis for

---

[5] As noted, the trial court concluded that there was no evidence to support a breach of warranty claim based on actual or implied authority; the court allowed the jury to consider only whether McDonald had apparent authority to issue a warranty. Plaintiffs do not assign error to that ruling.

finding the existence of apparent authority. Accordingly, we reverse.

To explain how we reach that result, we begin with a discussion of what is necessary to establish apparent authority, in light of prior case law. In *Badger*, the plaintiffs brought an action against an investment company for damages arising out of the sale of unregistered securities by persons employed as "registered representatives" of the company. On appeal, the Supreme Court considered whether there was sufficient evidence of the representatives' apparent authority to sell the securities. The court explained that "apparent authority" exists when an agent does not possess the actual or implied authority to act for the principal in the matter but nevertheless acts "with the appearance of authority," and is created

> " 'only by some conduct of the principal which, when reasonably interpreted, causes a third party to believe that the principal consents to have the apparent agent act for him on that matter. The third party must also rely on that belief.' "

*Badger*, 311 Or at 24 (quoting *Mattson v. Commercial Credit Business Loans*, 301 Or 407, 422, 723 P2d 996 (1986); *Jones v. Nunley*, 274 Or 591, 595, 547 P2d 616 (1976)). The court further explained that apparent authority arises when

> " 'the principal has clothed the agent with apparent authority to act for the principal in that particular. In other words, the principal permits the agent to appear to have the authority to bind the principal.' "

*Id.* (quoting *Wiggins v. Barrett & Associates, Inc.*, 295 Or 679, 687, 669 P2d 1132 (1983)). The court also made note of the following standard from *Restatement (Second) of Agency* section 27 comment a (1958):

> " 'For apparent authority there is the basic requirement that the principal be responsible for the information which comes to the mind of the third person * * *. Thus, either the principal must intend to cause the third person to believe that the agent is authorized to act for him, or he should realize that his conduct is likely to create such belief. The information received by the third person may come directly

from the principal by letter or word of mouth, from author-ized statements of the agent, from documents or other indi-cia of authority given by the principal to the agent, or from third persons who have heard of the agent's authority through authorized or permitted channels of communica-tion. Likewise, * * * apparent authority can be created by appointing a person to a position, such as that of manager or treasurer, which carries with it generally recognized duties; to those who know of the appointment there is apparent authority *to do the things ordinarily entrusted to one occupying such a position*, regardless of unknown limi-tations which are imposed upon the particular agent. So, too, a person who permits another to do an act in such a way as to establish in a community a reputation for having authority to act, either by directing the agent so to repre-sent, or by directing him to act and doing nothing to prevent the spread of such information by the agent or by others, creates apparent authority with respect to those who learn of the reputation.' "

*Badger*, 311 Or at 24-25 n 9 (quoting *Restatement* at § 27 com-ment a) (emphasis added).

Applying those principles in *Badger*, the court explained that, in order for the company to be bound by the agent's acts, the plaintiffs had to show that the company had "provided information to the plaintiffs that was either intended to cause the plaintiffs to believe" that the represen-tatives were authorized to act for the company, or that the company "should have realized that its conduct was likely to create such belief" and that, from such information or con-duct of the company, the plaintiffs reasonably believed that the representatives were authorized to act for the company. *Id.* at 25. The court noted that there was evidence in the rec-ord that the company was in the business of selling securi-ties; that the representatives were employed by the company; that the company sent a letter to its customers announcing their employment; that it sent a second letter to announce one representative's assignment to certain customer accounts; that the letters did not inform the customers of any limitations of the representatives' authority to act for the company; that the representatives' subsequent communica-tions with customers were on company stationery; that sales presentations regarding the unregistered securities were

made on the company's premises and, on one occasion, during normal business hours; and that the representatives received calls regarding the unregistered securities at the company's place of business. Conversely, the company never notified the customers that it did not approve the sale of unregistered securities. *Id.* at 25-26. Viewing that evidence in the light most favorable to the plaintiffs, the court concluded that the evidence provided a sufficient basis for the jury to find that the company "provided information intended to cause third persons to believe" that the representatives were authorized to sell the unregistered securities. *Id.* at 26; *see also Wiggins,* 295 Or at 687 (apparent authority exists when the principal clothes the agent with authority to act completely outside the agent's express or implied authority); *Checkley v. Boyd,* 198 Or App 110, 134, 107 P3d 651, *rev den,* 338 Or 583 (2005) ("Apparent authority 'can be created only by some conduct of the principal [that], when reasonably interpreted, causes a third party to believe that the principal consents to have the apparent agent act for him on that matter. The third party must also rely on that belief.' " (Quoting *Jones,* 274 Or at 595.)).

*Badger* provides guidance in two respects. First, it indicates that the alleged apparent authority of the agent must pertain to the particular "things," "matter," or function that the agent performs—in that case, selling securities. Second, by referring to the quoted portion of the *Restatement* at section 27 comment a, *Badger* indicates that the Supreme Court agreed with the concept that, to the extent that a principal creates apparent authority by appointing a person to a position, the authority thereby created is limited to the authority "to do the things *ordinarily* entrusted to one occupying such a position." (Emphasis added.) *See also Restatement* at § 27 comment d (explaining, in the context of setting out principles relating to "[t]hird persons who know of an agent's employment but not his authority," that "a manager has apparent authority to do those things which managers in that business at that time and place *customarily* do, as to persons who know that he is a manager, although they do not know what powers managers in such a business have"

and noting that that principle is consistent with the objective theory of contracts) (emphasis added)).[6]

■      In this case, ChemRex does not dispute that McDonald was the selling agent for the stucco system who, moreover, held the company title of "territory manager" for Oregon and Washington. However, we conclude, consistently with the principles referred to in *Badger*, that evidence of McDonald's role as selling agent and his title of territory manager are not sufficient to show that ChemRex clothed McDonald with apparent authority to issue a warranty. Rather, plaintiffs were required to show either (1) further conduct by ChemRex conferring on him the authority to perform the specific function at issue here—warranting the product sold—or (2) that persons in McDonald's position *customarily* have such authority and that plaintiffs knew that McDonald was a person in that position.

As to the former, plaintiffs produced no evidence of any conduct by ChemRex that, reasonably interpreted, informed plaintiffs that McDonald had warranty authority.

---

[6] *Houck v. Feller Living Trust*, 191 Or App 39, 79 P3d 1140 (2003), also is instructive. In that case, the attorney for a trust obtained two loans to be used as financing for the attorney's personal residence and business. The promissory notes named the trust as maker and pledged trust property as collateral. When the attorney defaulted on the loans, the plaintiff lender sought to foreclose on the trust property, arguing that the attorney had apparent authority to obtain the loans. The trial court granted summary judgment to the trust, and we affirmed. We explained that, where the plaintiff was aware that the attorney was using the loans for his own personal purposes and had examined the power of attorney, which did not expressly authorize that particular use of trust property, the plaintiff was "aware of facts that put her on inquiry notice that [the attorney] was exceeding his authority." *Houck*, 191 Or App at 44. *Compare National Mortgage Co. v. Robert C. Wyatt, Inc.*, 173 Or App 16, 25, 20 P3d 216, *rev den*, 332 Or 430 (2001) (the existence of authority to receive service of process did not demonstrate apparent authority to appear on behalf of the person in a court proceeding), *with Morse Bros., Inc. v. Kemp Construction, Inc.*, 147 Or App 217, 222-23, 935 P2d 464 (1997) (by permitting a person to accept and sign for registered and certified mail over a several-year period, a company clothed that person with apparent authority to perform that function), *and Kaiser Foundation Health Plan v. Doe*, 136 Or App 566, 573, 903 P2d 375 (1995), *adh'd to as modified on recons*, 138 Or App 428, 908 P2d 850, *rev den*, 324 Or 394 (1996) (in the context of settlement negotiations, where a principal permitted her attorney to "do all the negotiating" on the principal's behalf, including conveying offers and counteroffers between the parties, the principal's conduct was reasonably interpreted as having given the attorney authority to accept the opposing party's final offer).

Plaintiffs produced no evidence of any written materials generated by ChemRex relating to the scope of McDonald's authority as a territory manager or, more specifically, his authority to warrant products. *Cf. Badger*, 311 Or at 25-26 (a letter sent by the principal announcing the salesperson's appointment without limitation as to the type of sales, as well as its assignment of the salesperson to certain accounts, clothed the salesperson with apparent authority to conduct sales of unregistered securities). The company's "data sheets" describing the stucco system and its components did not state that territory managers or salespersons were authorized to provide warranties or that a five-year warranty was available; the data sheet for the corrosion inhibitor contained only a one-year warranty of merchantability. Nor did anyone in the ChemRex management hierarchy ever inform plaintiffs, either orally or in writing, that McDonald was attending the September 1998 meeting to address plaintiffs' concerns about the stucco system. Rather, plaintiff Todd Taylor testified that Lepis, the TFC project foreman who installed the system, arranged for McDonald to attend the meeting and that he, Taylor, had never seen the "product data" on the stucco system, including the sample warranty form that TFC had provided at the time it suggested installing the SonoWall stucco system.[7] Plaintiff Charlotte Taylor testified that, when McDonald told the Taylors that "you have a five-year warranty," "[w]e didn't know we had a five-year warranty. That was the first we had heard about a warranty."[8] When asked whether she understood McDonald's statement to refer to a warranty that "was already in place," she responded, "No. We didn't—there was no warranty in place."

■    We turn to evidence in the record relating to the usual or customary scope of authority of a person in McDonald's position. As an initial matter, although, as noted, the parties do not dispute that McDonald held the position of

---

[7] The sample warranty form stated, in part, that a five-year guarantee "will be in effect only after * * * the Guarantee has been signed by a Sonneborn Technical Services Representative and a ChemRex officer."

[8] We note that, by their own testimony, plaintiffs were experienced builders and developers; Todd Taylor testified that he had been involved in the industry for 30 years. Gerding testified that, "in terms of construction issues," Todd Taylor was "hands-on" and "[p]retty knowledgeable."

ChemRex's territory manager for Oregon, the record does not demonstrate that plaintiffs were aware during the September 1998 meeting that that was McDonald's position or title. Again, in his testimony, plaintiff Todd Taylor referred to McDonald as a "manufacturer's representative."[9] Taylor also testified that Lepis brought McDonald to the meeting and that he did not believe that he, Taylor, had ever met McDonald before that meeting.

That uncertainty aside, there is considerable evidence in the record pertaining to whether a person in McDonald's position in the ChemRex management hierarchy customarily had authority to issue a warranty—and none of it supports plaintiffs' position. Mosloski, who was the manager of technical services and administered the warranty program for the SonoWall division of ChemRex at the relevant time, testified that the usual process for granting warranties for ChemRex products was for the contractor or owner to obtain a warranty request packet and complete a request during or at the completion of application or installation. The request was made on standard warranty request forms supplied by ChemRex and included detailed information about the particular application or installation at issue. Typically, the request form would be returned to the salesperson, who would then send it to the warranty administrators for processing and approval. Although a salesperson had authority to tell a customer that ChemRex "can give you a five-year warranty," the actual issuance of the warranty was carried out by the company's warranty program administrator. Specifically as to McDonald, Mosloski testified that he was part of the sales force and "had tech people available to him as a resource." Mosloski testified that McDonald had authority to use ChemRex letterhead stationery but that he had no authority to approve warranties, such as by orally approving a warranty in the field; he had authority only to request warranties.

---

[9] Gerding testified that he knew that McDonald was the "territorial manager for Oregon for ChemRex," although he also referred to McDonald as the "Sonneborn rep." Lepis's testimony indicated that he understood McDonald to be ChemRex's "represent[ative]"; he also referred to McDonald as a "technical guy." Ramsay-Gerding's supervisor on the project also referred to McDonald as ChemRex's representative.

White, a waterproofing consultant who distributed stucco products during the relevant time period, testified to similar effect: that McDonald assisted in requesting warranties for Sonneborn products, including negotiating with owners regarding the length of the requested warranty, but did not himself "issue" them. Rather, after warranties were requested, they came directly from ChemRex's Sonneborn division.[10]

Lepis—who, in addition to being the project foreman for the stucco installation, was also a stucco distributor—testified more generally that warranties for siding applications vary by the job and that the usual process for obtaining a warranty from Sonneborn was for an applicator to fill out an application and send it to the manufacturer, which would send back the warranty. He testified that, in the case of the stucco system installed at the O'Dysius Hotel, the warranty process was for McDonald to fill out the application form and send it to Sonneborn. When asked whether, "if this warranty process had been completed, you would have expected this warranty form to be issued," Lepis answered, "That's supposed to be done."

Other testimony relevant to the question of the customary authority of a person in McDonald's position includes that of Bartel, an architect hired by ChemRex to assess the condition of the hotel. Bartel testified that, when determining the performance characteristics of a product, he reviewed the "technical data sheets and any information I can get from the technical support department of the manufacturer." He testified that, if "somebody who is in the chain of information but is not the technical department" told him something that appeared to be different from what was stated in the data sheets, he would ask that person "to produce a clarification from technical support in writing." When asked whether it would be reasonable to rely on representations by the "representative from the territory of Oregon for ChemRex and for Sonneborn for a particular product," Bartel responded, "It

---

[10] McDonald testified that he assumed that he wrote the July 1999 letter to Lepis, in which he reiterated that the system had a five-year warranty, because the warranty paperwork was turned in. We note that plaintiffs adduced no evidence demonstrating that ChemRex's process for obtaining a warranty for its product differed from the usual practice in the construction industry as a whole.

would depend upon who he was" and that "we challenge what representatives—supposed representatives say all the time and ask for backup letters." He testified, "I'd say, 'I want to talk to the tech rep.' "

Finally, Johnson, a construction consultant, testified that it was an accepted practice in the construction industry to rely on a manufacturer's representative to provide information concerning the performance capability of a product. He also testified, however, that if a manufacturer's representative supplied him with product data sheets, he would review those as well. He did not provide any further testimony to suggest whether and under what circumstances a manufacturer's representative would be expected to have authority to provide a warranty as to a product's future performance.

We conclude that the above evidence, even considered in the light most favorable to plaintiffs, is insufficient to create a jury question regarding McDonald's apparent authority to warrant the stucco system. First, it is insufficient to allow a jury to find or infer the existence of any conduct by ChemRex, other than its conduct of placing him in the position of territory manager, conferring that authority on McDonald. In particular, evidence that he was authorized to use letterhead stationery is insufficient to demonstrate that ChemRex clothed him with apparent authority to use that stationery to make any conceivable representation about the company's products. Indeed, the testimony of Charlotte Taylor that McDonald's offer of a warranty at the September 1998 meeting "was the first we had heard about a warranty" demonstrates that plaintiffs arguably were put on notice that McDonald lacked authority to take that action. *See Barbour et al. v. Johnson et al.*, 201 Or 375, 383, 269 P2d 531, *on reh'g*, 270 P2d 633 (1954) (a principal is not bound by acts of an agent in excess of the agent's actual authority " 'where the facts and circumstances * * * are such as to put [the third person] upon inquiry as to the authority' " of the agent (quoting *Phez Co. v. Salem Fruit Union et al.*, 113 Or 398, 429, 233 P 547 (1925)); *see also id.* at 387 ("Apparent authority does not arise where the lack of the agent's authority is known, or should be known, to the party dealing with the agent.").

Second, even assuming that plaintiffs knew of McDonald's title or position as ChemRex's territory manager for Oregon as of the time of the September 1998 meeting—which is not established in the record—such evidence would be insufficient to allow a jury to find or infer that persons in that position customarily had authority to warrant products. Rather, as described above, the evidence overwhelmingly demonstrates the contrary—namely, that a person in McDonald's position had authority only to assist in requesting a warranty, and that such a person had no authority actually to issue a warranty.

It follows that the trial court erred in denying ChemRex's motion for a directed verdict on plaintiffs' claim for breach of an express warranty. We reverse and remand for entry of a judgment in ChemRex's favor on the Taylors' breach of express warranty claim.

Given our disposition of ChemRex's first assignment of error on cross-appeal, we need not address ChemRex's other assignments of error pertaining to entry of judgment in favor of the Taylors. Specifically, we need not address ChemRex's second assignment of error on cross-appeal (asserting that the trial court erred in denying its motion for judgment on the pleadings based on its statute of limitations defense against the Taylors' claim and in ruling that the Taylors' claim was timely as a matter of law) and its third assignment of error on cross-appeal (asserting that the trial court erred in entering a judgment on the Taylors' claim that did not conform to the jury's verdict on that claim).

■ We turn, then, to the parties' assignments of error not rendered entirely moot by our disposition of ChemRex's first assignment of error. We begin with plaintiffs' second assignment of error, in which they assert that the trial court erred in submitting to the jury ChemRex's statute of limitations defense against the development company's breach of express warranty claim. In that regard, plaintiffs first contend that the company's claim is subject to the four-year limitations period set out in ORS 72.7250[11] and that, consistently with other jurisdictions' construction of that provision

[11] ORS 72.7250 provides, in pertinent part:

"(1) An action for breach of any contract for sale must be commenced within four years after the cause of action has accrued. * * *

of the Uniform Commercial Code (UCC), the claim did not accrue until they discovered the rust *and* ChemRex refused to cure it. According to plaintiffs, the evidence is undisputed that no rust was discovered before September 1999, that they and Ramsay-Gerding demanded a cure of the defects in the stucco system no earlier than August 4, 2000, and that the development company was named as a plaintiff in the case on April 1, 2004. Alternatively, plaintiffs contend that, under ORCP 23 C,[12] the development company's status as a plaintiff for the purpose of the breach of warranty claim relates back either to the date on which Ramsay-Gerding filed its breach of warranty claim (April 29, 2002) or the date on which the Taylors filed their breach of warranty claim (August 8, 2003). Plaintiffs contend that relation back is proper here because Ramsay-Gerding's claim and the Taylors' original complaint each gave ChemRex notice of the events on which the development company's breach of warranty claim is based. Plaintiffs argue that, for both of the described reasons, the development company's claim was timely as a matter of law.

ChemRex responds that the claimed error was not preserved. According to ChemRex, plaintiffs never availed themselves of any of the procedures for removal of the limitations defense from the case, such as a motion to strike, a motion for a partial directed verdict, or a request for a peremptory instruction. Rather, ChemRex itself moved for a

---

"(2) A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered."

[12] ORCP 23 C, which governs relation back of amendments, provides:

"Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading. An amendment changing the party against whom a claim is asserted relates back if the foregoing provision is satisfied and, within the period provided by law for commencing the action against the party to be brought in by amendment, such party (1) has received such notice of the institution of the action that the party will not be prejudiced in maintaining any defense on the merits, and (2) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party brought in by amendment."

directed verdict on that defense; although plaintiffs asserted at that time that the defense presented a matter of law for the court, it made no motion in that regard. More significantly, counsel for the development company later agreed that the defense should be submitted to the jury.

On the merits, ChemRex does not dispute that the four-year statute of limitations of ORS 72.7250 applies or that the alleged warranty was one for future performance. It asserts, however, that there was evidence from which the jury could conclude that the development company discovered or should have discovered any breach more than four years before it joined the action on April 1, 2004. ChemRex first contends that the development company's claim for breach of warranty should not be deemed as arising from the same events as the Taylors' claim; rather the development company's claim was subject to separate proof of the creation of a warranty, including a bargain, consideration, and reliance. Accordingly, the development company's claim could not relate back to the date of the filing of the Taylors' claim. For the same reason, it did not relate back to the date that Ramsay-Gerding filed its breach of warranty claim; in any event, the development company's claim did not "supersede[ ]" Ramsay-Gerding's complaint for the purposes of relation back—it superseded only the Taylors' complaint. Finally, ChemRex contends that plaintiffs did not argue below that the claim accrued when it refused to honor the warranty, that by its terms the warranty offered protection against the occurrence of rust, and that, even assuming that the terms of the warranty were ambiguous, the warranty should be construed in the light most favorable to ChemRex (that is, that any warranty was against the occurrence of rust). ChemRex argues that the evidence that the rust was discovered in the late summer or early fall of 1999 provided a sufficient basis for the jury's finding that the development company's entry into the case on April 1, 2004, was untimely.

In reply, plaintiffs urge us to consider the issue to be preserved. They acknowledge that, at the time that the trial court instructed the jury, they explicitly agreed to submit the limitation issue to the jury. They assert, however, that they argued throughout the trial that their breach of warranty

claim was timely, giving the trial court "multiple chances to make the right ruling," and that, in effect, they merely acquiesced to submission of the issue to the jury. On the merits, plaintiffs contend that the five-year warranty given by ChemRex's representative, McDonald, at his September 1998 meeting with Todd Taylor constituted the sole warranty at issue in this case and that Ramsay-Gerding's and the Taylors' breach of warranty claims therefore notified ChemRex of the "claim, transaction, or occurrence" that was the basis of the development company's claim for purposes of the relation-back doctrine. They again assert that, regardless of whether the development company's claim related back to Ramsay-Gerding's claim or only to the Taylors' later-filed claim, it was timely even if the trigger event was the discovery of the rust in September 1999. Plaintiffs also again argue that, in any event, the proper trigger is ChemRex's failure, as of August 2000, to remedy the problem.

We agree with ChemRex that plaintiffs failed to preserve their claim of error. Before instructing the jury, the trial court discussed with the parties whether the development company's breach of warranty claim was timely or untimely as a matter of law. ChemRex contended that the claim was untimely as a matter of law. Although plaintiffs had not filed a motion to strike ChemRex's defense or for partial directed verdict, they argued that the development company's claim was timely as a matter of law because, although it was not filed until April 1, 2004, it related back to the filing of Ramsay-Gerding's breach of warranty claim. Nevertheless, plaintiffs expressly agreed to submit the timeliness issue to the jury.

Moreover, the trial court instructed the jury that the development company's claim was filed on April 1, 2004, and that ChemRex therefore was required to prove that, before April 1, 2000, the development company knew or should have known of facts that would have made a reasonable person aware of a substantial possibility that ChemRex's alleged breach of warranty had caused the development company harm. Implicit in that instruction was the trial court's determination as a matter of law that the development company's claim did not relate back to the date of filing of either the

Taylors' or Ramsay-Gerding's breach of warranty claim. Plaintiffs did not object to that instruction, and the jury, following it, could have determined that the development company had sufficient notice of the claim before April 1, 2000. *See* ORCP 59 H (a party may not obtain review of an asserted error by the trial court in submitting a statement of an issue to the jury unless the party identified the asserted error to the trial court). Plaintiffs therefore failed to preserve their second assignment of error, and we reject it on that basis.

The two rulings above—our determination that ChemRex was entitled to a directed verdict in its favor on the Taylors' claim for breach of express warranty, and our rejection of plaintiffs' challenge to the verdict in ChemRex's favor on the development company's claim—obviate the need to address any of the parties' other assignments of error. Having upheld the judgment for ChemRex on the development company's claim and having held that it was entitled to judgment on the Taylors' claim, we need not consider whether, as argued in plaintiffs' first assignment of error, the trial court erred as a matter of law in submitting to the jury the issue of the parties' comparative fault as to plaintiffs' claims. Further, because the jury found that the development company's claim was time barred and we have rejected plaintiffs' challenge to the submission of that issue to the jury, we need not consider ChemRex's cross-assignment of error, which challenges the trial court's denial of its motion for a directed verdict in its favor on the development company's breach of express warranty claim. Finally, for the same reasons, we need not consider ChemRex's fourth assignment of error on cross-appeal, in which it contends that the trial court erred in ordering bifurcation of plaintiffs' breach of express warranty claim.

On appeal, affirmed; on cross-appeal, reversed and remanded for entry of judgment in favor of cross-appellant.